UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE

PENNEAST PIPELINE COMPANY, LLC,                 :
                                                :
                                                : DOCUMENT ELECTRONICALLY FILED
                          Plaintiff,            :
                                                :
                     v.                         : Hon. BRIAN R. MARTINOTTI,
                                                : U.S.D.J.
A PERMANENT EASEMENT FOR 1.74                   :
ACRES ± AND TEMPORARY EASEMENT FOR :CIVIL ACTION
2.24 ACRES ± IN HOPEWELL TOWNSHIP, :
MERCER COUNTY, NEW JERSEY, TAX      :Civ. Action No.:
PARCEL NO. 1106-92-2.011            :See Exhibit A attached
                                                :
RENZE WEN, JERSEY CENTRAL POWER &   :
LIGHT COMPANY, STATE OF NEW JERSEY,:
BY THE SECRETARY OF THE DEPARTMENT :
OF AGRICULTURE, STATE AGRICULTURE   :
DEVELOPMENT COMMITTEE, THE TOWNSHIP:
OF HOPEWELL, FIRST CHOICE BANK;     :
                                                :
AND ALL UNKNOWN OWNERS,                          :
                                                :
                                                :
                          Defendants.           :

STATE DEFENDANTS BRIEF SEEKING DISMISSAL AND IN OPPOSITION TO
PRELIMINARY INJUNCTION APPLICATION

                              GURBIR S. GREWAL
                              ATTORNEY GENERAL OF NEW JERSEY
                              Attorney for State Defendants
                              Division of Law
                              R.J. Hughes Justice Complex
                              P.O. Box 093
                              Trenton, New Jersey 08625-0112
                              (609) 376-2803 (phone)
                              (609) 341-5030 (fax)
                              mark.collier@law.njoag.gov

David C. Apy
Assistant Attorney General
     Of Counsel

Mark Collier (MC6192)
Deputy Attorney General
     On the Brief

<u>EXHIBIT A</u>

<u>Dkt. No.</u>        <u>Case Name</u>

18-01684 PennEast Pipeline Company, LLC vs. 1.74 acres
18-01774 PennEast Pipeline Company, LLC vs. 0.26 acres
18-01603 PennEast Pipeline Company, LLC vs. 2.14 acres
18-01771 PennEast Pipeline Company, LLC vs. 0.88 acres
18-01699 PennEast Pipeline Company, LLC vs. 1.41 acres
18-01709 PennEast Pipeline Company, LLC vs. 2.35 acres
18-01670 PennEast Pipeline Company, LLC vs. 1.29 acres
18-01682 PennEast Pipeline Company, LLC vs. 0.01 acres
18-01638 PennEast Pipeline Company, LLC vs. 0.57 acres
18-01701 PennEast Pipeline Company, LLC vs. 1.06 acres
18-01689 PennEast Pipeline Company, LLC vs. 1.53 acres
18-01754 PennEast Pipeline Company, LLC vs. 1.86 acres
18-01756 PennEast Pipeline Company, LLC vs. 0.73 acres
18-01668 PennEast Pipeline Company, LLC vs. 0.03 acres
18-01743 PennEast Pipeline Company, LLC vs. 1.20 acres
18-01669 PennEast Pipeline Company, LLC vs. 1.29 acres
18-01778 PennEast Pipeline Company, LLC vs. 2.23 acres
18-01643 PennEast Pipeline Company, LLC vs. 2.11 acres
18-01721 PennEast Pipeline Company, LLC vs. 1.89 acres
18-01597 PennEast Pipeline Company, LLC vs. 1.92 acres
18-01672 PennEast Pipeline Company, LLC vs. 4.55 acres
18-01673 PennEast Pipeline Company, LLC vs. 1.93 acres

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ............................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ....................... 2

    A. NEW JERSEY OPEN SPACE AND FARMLAND PRESERVATION
       PROGRAMS ................................................... 3

    B. FERC PROCEEDINGS ......................................... 7

    C. EMINENT DOMAIN PROCEEDINGS .............................. 10

    D. PENNEAST'S FAILURE TO ENGAGE IN ANY NEGOTIATIONS ...... 13

    E. PRELIMINARY INJUNCTION APPLICATION .................... 14

ARGUMENT

    Point I ................................................... 15

        ELEVENTH AMENDMENT SOVEREIGN IMMUNITY BARS PENNEAST
        FROM SEEKING TO CONDEMN STATE PROPERTY IN FEDERAL
        COURT SINCE THE COURT LACKS JURISDICTION ........... 15

        A. The Limited Exceptions to Immunity Do Not Apply ..18

    Point II .................................................. 21

        PENNEAST'S CONDEMNATION POWER IS LIMITED ........... 21

    Point III ................................................. 23

        THE COURT SHOULD DECLINE PROCEEDING WITH PENNEAST'S
        CLAIMS AGAINST THE NON-STATE PROPERTY OWNERS
        BECAUSE STATE DEFENDANTS ARE INDISPENSABLE FOR
        DETERMINING JUST COMPENSATION ...................... 23

    Point IV .................................................. 24

        PLAINTIFF HAS NOT SATISFIED THE NATURAL GAS ACT'S
        EMINENT DOMAIN REQUIREMENTS WITH RESPECT TO THE
        STATE PRESERVED PROPERTIES ........................ 24

A. Plaintiff has not established it has a FERC Certificate regarding the State Preserved Properties ...................................... 25

B. State Defendants are "Property Owners" under the NGA .......................................... 26

C. PennEast Failed to Negotiate with State Defendants as Required by the NGA ............... 28

Point V .................................................. 31

PLAINTIFF'S PRELIMINARY INJUNCTION APPLICATION IS NOT RIPE ........................................... 31

Point VI ................................................. 31

PLAINTIFF FAILS TO MEET ANY OF THE FOUR PRONGS NECESSARY TO OBTAIN A PRELIMINARY INJUNCTION ........ 31

A. PennEast has not established a likelihood of success on the merits ................... 33

B. PennEast cannot establish irreparable harm .. 34

C. The State Defendants will suffer greater harm if preliminary relief is granted and the public interest does not favor a preliminary injunction as the condemnations are premature .............................. 37

(i)  State Open Space and Farmland Preservation Programs will be Disrupted ........................... 37

(ii) The Pipeline Route is Likely to Change ............................... 41

CONCLUSION .................................................. 45

TABLE OF AUTHORITIES

PAGE

CASES

Acierno v. New Castle County, 40 F.3d 645
  (3rd Cir 1994)40 F. 3d. 645 (3rd Cir. 1994) . . . . . . . . . . . . . . . . . . 45

Alden v. Me., 527 U.S. 706 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,
  42 F.3d 1421, 1427 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 32

Amtrak v. 900 2nd St. Northeast, 266 F. Supp. 3d 63
  (D.D.C. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) . . . . . . . . . . . . . . 30

Blatchford v. Native Village of Noatak & Circle Village,
  501 U.S. 775 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86
  (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Clean Air Council v. Mallory, 226 F. Supp. 2d 705
  (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

College Sav. Bank v. Florida Prepaid Post Secondary Educ.
  Expense Bd., 527 U.S. 666 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.,
  833 F.3d 360 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Dugan v. Rank, 372 U.S. 609 (1963) . . . . . . . . . . . . . . . . . . . . . . . . 17

Ex Parte Young, 209 U.S. 123 (1908) . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. Mar. Comm'n v. South Carolina State Ports Auth.,
  535 U.S. 743 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Flamini v. Velez, 2013 U.S. Dist. LEXIS 101182,
  12-13 (D.N.J. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Great Northern Life Ins. v. Read, 322 U.S. 47 (1944)) . . . . . . . . 19

Groupe SEB United States, Inc. v. Euro-Pro Operating, LLC,

774 F.3d 192 (3d. Cir. 2014)....................................32

Grupo Mexicano de Desarrollo S.A. v. Alliance
Bond Fund, Inc., 527 U.S. 308 (1999) .........................31

Hawaii v. Gordon, 373 U.S. 57 (1963) .........................17

Idaho v. Coeur d'Alene Tribe of Idaho,
521 U.S. 261 (1997)...........................................17

Kos Pharm., supra, 369 F.3d at 708 ...........................34

National R. Passenger Corp. v. Two Parcels of Land,
822 F.2d 1261 (2d Cir. 1987)..................................22

Nutrasweet Co. v. Vit-Mar Enters., 176 F.3d 151
(3d Cir. 1999)................................................37

Opticians Assn of Am. v. Indep. Opticians of Am.,
920 F.2d 187 (3d Cir. 1990)...................................32

Pappan Enters. v. Hardee's Food Sys., 143 F.3d 800
(3d Cir. 1998)................................................34

Pennhurst State School Hosp. v. Halderman,
465 U.S. 89 (1984)..................................17, 19, 23

Pharm., Inc. v. Andrx Corp., 369 F.3d 700
(3d Cir. 2004)................................................32

Quern v. Jordan, 440 U.S. 332 (1979) .........................23

Rudolph v. Adamar of N.J., Inc., 153 F. Supp. 2d 528
(D.N.J. 2001).................................................20

Seminole Tribe of Florida v. Florida,
517 U.S. 44 (1996)..................................17, 18, 19

Skehan v. Board of Trustees of Bloomsburg State College,
590 F.2d 470 (3d Cir. 1978)...................................19

Transwestern Pipeline Co., LLC v. 17.19 Acres,
550 F.3d 770 (9th Cir 2008) ................................31

U.S. v. Carmack, 329 U.S. 230 n.13 (1946) ....................22

United States v. General Motors Corp, 323 U.S. 373

(1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Welte, 635 F.Supp. 388
   (D.N.D. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Whitehouse Hotel L.P. v. Comm'r, 615 F.3d 321
   (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Will v. Michigan Dept. of State Police, 491 U.S. 58
   (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Winter v. Natural Res. Def. Council, Inc.,
   555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

## STATE REGULATIONS

N.J.A.C. 2:76-6.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.J.A.C. 2:76-6.15(a)2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.J.A.C. 7:36-2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.J.A.C. 7:45-9.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## STATE STATUTES

N.J.S.A. 4:1C-1 to -10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 40

N.J.S.A. 4:1C-4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 40

N.J.S.A. 4:1C-11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 41

N.J.S.A. 4:1C-12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 41

N.J.S.A. 4:1C-32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 41

N.J.S.A. 13:8A-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 40

N.J.S.A. 13:8A-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.J.S.A. 13:8C-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 39

N.J.S.A. 13:8C-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 40

N.J.S.A. 13:8C-31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.J.S.A. 13:8C-32 ............................................. 26

N.J.S.A. 13:13A-1 ............................................. 7

N.J.S.A. 13:13A-2 ............................................. 7

N.J.S.A. 59:1-1 .............................................. 20

## STATE CONSTITUTION

N.J. Const. art. VIII, § 22, ¶ 6 ....................... 3, 4, 38

N.J. Const. art. VIII, § 22, ¶ 7 ......................... 3, 38

## FEDERAL CONSTITUTION

U.S. Const. amend. XI ....................................... 16

## FEDERAL STATUTES

15 U.S.C. 717f(h) ..................... 13, 14, 25, 28, 29, 30

15 U.S.C. 717 ............................................... 18

42 U.S.C. 4251 .............................................. 30

49 U.S.C. 24301(a) .......................................... 22

## FEDERAL REGULATIONS

18 C.F.R. 157.20(b) ......................................... 35

18 C.F.R. 385.2008 .......................................... 36

18 C.F.R. 385.713(a)(2)(v) ................................... 9

49 C.F.R. 24.102(a) ......................................... 30

## FEDERAL RULES

Local Civil Rile 67.1(a) .................................... 14

OTHER SOURCES

Nancy A. McLaughlin, Condemning Conservation Easements:
   Protecting the Public Interest and Investment in
   Conservation, 41 U.C. Davis L. Rev. 1897 (2008)..............27

## PRELIMINARY STATEMENT

These cases involve Plaintiff's, PennEast Pipeline Company ("PennEast" or "Plaintiff") attempt to invoke inappropriately this court's jurisdiction to condemn State property interests in preserved land.

For a period spanning more than six decades, the citizens have voted to support and the State of New Jersey has spent billions of taxpayer dollars permanently preserving preciously scarce, unique undeveloped lands for recreation, conservation and farmland uses. That investment is now under threat of being undermined by PennEast, a private entity attempting to condemn the State's interests in over twenty separate preserved properties so that they may construct a natural gas pipeline thereon.

PennEast's condemnation actions should be dismissed because this court lacks jurisdiction over the State. Under the Eleventh Amendment to the United States Constitution, the State is immune from suit absent its consent and the State has not consented to these actions. Further, since the State's interests in the preserved properties are indispensable for determining just compensation for any taking, this court should refrain from proceeding with any condemnation related to these properties.

Should this court elect to exercise jurisdiction over the State, these actions should still be dismissed because PennEast has failed to even attempt to contract with the State in order to

1

acquire the property interests allegedly needed for the pipeline. Therefore, it has failed to meet the threshold statutory requirements under the Natural Gas Act needed to bring this action regardless of the court.

Finally, Plaintiff's application for a preliminary injunction should be denied because PennEast cannot succeed on the merits having failed to meet the statutory prerequisites of the Natural Gas Act. Further, the harm PennEast alleges is self-induced, the harm to the State through the disruption of its open space and farmland preservation programs would be both irreparable and far greater than the alleged harm to PennEast, and a preliminary injunction allowing entry, possession and clearing of precious resources would be premature.

For these reasons, the State urges this court to deny PennEast's request for injunctive relief and to dismiss these actions.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The facts set forth below relating to the State of New Jersey's Open Space and Farmland Preservation Programs, the PennEast pipeline project proceedings before FERC and the conditions imposed by FERC, the filing of these Eminent Domain Proceedings, PennEast's failure to engage in negotiations, and deficiencies in PennEast's Preliminary Injunction Application are

all relevant to the Court's consideration of PennEast's application for an Order of Condemnation and Preliminary Injunction.

## A. NEW JERSEY OPEN SPACE AND FARMLAND PRESERVATION PROGRAMS

The State of New Jersey is the most densely populated state in the United States.   Open space is under constant development pressure, making open space and farmland scarce resources. Thus, for over fifty years, New Jersey has spent billions of dollars to preserve open space and farmland. N.J.S.A. 13:8A-1. Under New Jersey's Constitution, state tax dollars are set aside annually for open space and farmland preservation programs.  N.J. Const. art. VIII, § 22, ¶ 6 & 7.  In 1998, New Jersey voters approved a Constitutional Amendment that created New Jersey's first stable source of funding for open space, farmland, and historic preservation efforts, from a portion of the State Sales and Use Tax.  N.J. Const. art. VIII, § 22, ¶ 7. This Constitutionally-dedicated money is set aside annually:

> to provide funding, including loans or grants, for the acquisition and development of lands for recreation and conservation purposes, for the preservation of farmland for agricultural or horticultural use and production, and for historic preservation … Ibid.

In 2014, New Jersey voters again chose to amend the Constitution to provide an additional source of open space and farmland preservation, this time from a portion of the State's Corporate

Business  Tax.  <u>N.J.  Const.</u>  art.  VIII,  §  22,  ¶  6.  This

Constitutionally dedicated money is set aside annually:

> only for: providing funding, including loans
> or grants, for the preservation, including
> acquisition, development, and stewardship, of
> lands  for  recreation  and  conservation
> purposes, including lands that protect water
> supplies and lands that have incurred flood or
> storm damage or are likely to do so, or that
> may buffer or protect other properties from
> flood  or  storm  damage;  providing  funding,
> including  loans  or  grants,  for  the
> preservation and stewardship of land for
> agricultural  or  horticultural  use  and
> production; … <u>Id.</u>

New  Jersey's  dedication  towards  preserving  open  space  and

farmland is reflected in statutes and bond issuances.  For example,

in the Garden State Preservation Trust Act ("GSPTA"), <u>N.J.S.A.</u>

13:8C-1, <u>et seq.</u>, the Legislature found:

> … that the acquisition and preservation of
> open space, farmland, and historic properties
> in  New  Jersey  protects  and  enhances  the
> character and beauty of the State and provides
> its  citizens  with  greater  opportunities  for
> recreation,  relaxation,  and  education;  *that
> the lands and resources now dedicated to these
> purposes  will  not  be  adequate  to  meet  the
> needs of an expanding population in years to
> come.* . .
>
> The  Legislature  further  finds  and  declares
> that the citizens of the State have indicated
> their  very  strong  support  for  open  space,
> farmland, and historic preservation efforts
> not only in the past approval of State Green
> Acres  bond  acts  and  numerous  county  and
> municipal dedicated funding sources for those
> purposes, but most recently in 1998 with the
> approval  of  an  amendment  to  the  New  Jersey
> Constitution  that  provides  for  a  stable  and

> dedicated source of funding for those purposes for the next decade and beyond.
>
> The Legislature therefore determines *that it is in the public interest to preserve as much open space and farmland, and as many historic properties, as possible* within the means provided by the 1998 constitutional amendment; that of the open space preserved, as much of those lands as possible shall protect water resources and preserve adequate habitat and other environmentally sensitive areas… <u>N.J.S.A.</u> 13:8C-2 (*emphasis added*).

The GSPTA references previous bond acts, which were authorized to acquire lands for recreation, conservation and agricultural purposes and to make grants to assist local units to acquire lands for such purposes. <u>N.J.S.A.</u> 13:8A-4; <u>N.J.S.A.</u> 4:1C-12.

In furtherance of these long-held policies, New Jersey has maintained crucial open space and farmland preservation programs within the New Jersey Department of Environmental Protection ("NJDEP") and the State Agriculture Development Committee ("SADC"), respectively. NJDEP's Green Acres program was created in 1961 to authorize the State to acquire and assist local governments to acquire land for recreation and conservation. See <u>N.J.S.A.</u> 13:8A-1 et seq. The citizens of New Jersey wholeheartedly support Green Acres, as evidenced by 13 successful Green Acres voter referendums since 1961, totaling $3.32 billion. Certification of Judeth Piccinini Yeany, at ¶6 (Hereinafter "Yeany Certification"). As of August 2017, the State of New Jersey, through the Green Acres

Program and its pre-1961 preservation efforts, has helped to preserve over 650,000 acres of land in New Jersey. Id., at ¶8.

SADC was established in 1983 by the Right to Farm Act, N.J.S.A. 4:1C-1 to -10, to protect farming operations. N.J.S.A. 4:1C-4(a). That same year, the Legislature passed the Agriculture Retention and Development Act ("ARDA"), a statute recognizing that the "strengthening of the agricultural industry and the preservation of farmland are important to the present and future economy of the State and welfare of [its] citizens[.]" N.J.S.A. 4:1C-12(a).

The ARDA authorized the SADC to preserve the dwindling farmland in the State by purchasing desirable farmland in fee simple, purchasing development easements, and providing cost-share grants to counties, N.J.S.A. 4:1C-11, et seq., thereby preserving, in perpetuity, the lands for agricultural uses. N.J.S.A. 4:1C-32. As of 2017, SADC and its partners have preserved over 2,500 farms, comprising over 200,000 acres of preserved farmland. Certification of Susan E. Payne, at ¶6 (Hereinafter "Payne Certification"). More than $1 billion of State monies have been committed to the preservation of farmland since the Farmland Preservation Program's inception. Ibid.

The State has also preserved environmentally valuable properties through the Delaware and Raritan Canal Commission ("DRCC"). The Delaware and Raritan Canal State Park Law of 1974,

N.J.S.A. 13:13A-1, et seq., established the DRCC.  The Legislature created the Canal Park, recognizing that the canal is a vital source of water supply and is of historic, ecological and recreational value.   N.J.S.A.  13:13A-2.   The Legislature established the DRCC as the entity responsible to ensure a consistent approach to land conservation along and through the Canal Park.   DRCC stream corridor easements protect water quality, and prohibit new structures and removal of vegetation or actions that would harm native vegetation.  N.J.A.C. 7:45-9.3.

### B. FERC PROCEEDINGS

PennEast is a private, corporate conglomerate owned by Red Oak Enterprise Holdings, Inc, a subsidiary of AGL Resources, Inc., NJR Pipeline Company, a subsidiary of New Jersey Resources, SJI Midstream, LLC, a subsidiary of South Jersey Industries, UGI PennEast, LLC, a subsidiary of UGI Energy Services, LLC, and Spectra Energy Partners, LP.   See  Exhibit  B  to Complaint[1], ¶3(Exhibit B to Complaint will hereinafter be referred to as "Order")  PennEast is a limited liability company under the State

---

[1] For the purposes of this brief, and unless otherwise specifically noted, citation to "Complaint" shall refer to the Verified Complaint filed by Plaintiff for Docket No. 18-01603. At the same time, the arguments made herein are applicable to all of the Condemnation Actions in which the State of New Jersey and/or any of its arms or subdivisions have been named as a Defendant. This is being done because the Verified Complaints filed by PennEast for the Condemnation Actions are fairly uniform and for ease of the court's reference.

of Delaware's laws and is managed by UGI Energy Services, LLC. Order, ¶3.

On September 24, 2015, PennEast filed its application with the Federal Energy Regulatory Commission ("FERC") for a Certificate of Public Convenience and Necessity ("CPCN") pursuant to Section 7(c) of the Natural Gas Act ("NGA"), 15 U.S.C. 717 et seq., to construct and operate a new natural gas pipeline in Pennsylvania and New Jersey. Order, ¶1. The proposed 36-inch-diameter pipeline would run 116 miles, stretching from Luzerne County, Pennsylvania, to Mercer County, New Jersey and would include a new compressor station and three proposed lateral pipes. ("Project"). Id.; see also Order ¶5. The pipeline route has the potential to slice through nearly fifty properties in New Jersey upon which the State, a county, a municipality, or a non-profit group either own in their entirety or hold a conservation easement or restriction.

As part of its obligation to demonstrate public need for the Project, PennEast submitted long-term precedent agreements with 12 shippers that amounted to 90% of the Project's capacity. Order, ¶6. Notably, at the time of the application, 6 of the 12 shippers were PennEast affiliates, and their long-term precedent agreements comprised a clear majority of the Project's overall capacity. Ibid.

On January 19, 2018, FERC issued an Order granting PennEast a CPCN for the Project. The Order relied upon the subscribed capacity

to demonstrate public need and prohibited PennEast from commencing construction of the Project – including tree clearing, excavation, trenching, pipe laying and post-construction restoration – until all of the Order's conditions have been met. See Order, ¶B(3)(page 82 of Order). One of the Order's conditions requires PennEast to obtain "all applicable authorizations required under federal law," including Clean Water Act permits. App. A to Order, ¶10. New Jersey has assumed jurisdiction over the relevant Clean Water Act permits. Certification of Diane Dow, at ¶2 (Hereinafter "Dow Certification") PennEast has no permits from New Jersey yet and has no pending applications before the State for permits. Id., at ¶3-8.

Moreover, the Order does not permit PennEast to "change the size of" the pipeline or to transport any commodity other than natural gas. App. A to Order, ¶4 The Order does not prohibit any and all "structures" within the Rights of Way.

The Order requires PennEast to construct and make the Project operational within two years of January 19, 2018. Order, ¶219(B)(1). Notwithstanding the two year date, FERC has routinely and without delay approved requests for extensions of time to construction deadlines such as the one contained in the PennEast Order.

The Order is a final order, making it eligible for a rehearing request pursuant to 18 C.F.R. 385.713(a)(2)(v). On February 20, 2018, NJDEP filed a joint stay-rehearing request. FERC has 30 days

to grant or deny the request or abrogate or modify the Order. The stay request asks that it be continued during the pendency of any tolling order FERC may issue. Although FERC staff has granted other parties' rehearing requests for the limited purpose of considering the matters raised, FERC has not yet decided the State's joint stay-rehearing request.

## C. EMINENT DOMAIN PROCEEDINGS

On February 6, 2018, PennEast filed with this court individual Notices of Condemnation ("Notice of Condemnation") and Verified Complaints in Condemnation ("Complaint") for 62 separate properties (collectively "Condemnation Actions"). Of those properties, State Defendants[2] hold property rights to a minimum of 20 parcels as permanently preserved for recreational, conservation and/or agricultural uses ("State Preserved Properties")[3].

Through the Condemnation Actions, PennEast seeks to condemn permanent and temporary rights-of-way over and through the State Preserved Properties. Specifically, while the acreage of the individual Rights-of-Way differs between State Preserved

---

[2] "State Defendants" refers to the State of New Jersey, NJDEP, SADC and DRCC, each of which has been named as a Defendant in one or more of the Condemnation Actions.

[3] The State Preserved Properties are more fully described in the Yeany Certification, at ¶14; the Payne Certification, at ¶11; and Exhibit D to Verified Complaint for Dkt. No. 18-01774. The State interest identified in the Verified Complaint for Dkt. No. 18-01771 does not consist of property permanently preserved for recreation, conservation and/or agricultural uses. However, the State maintains that this court cannot exercise jurisdiction over the State for purposes of that matter due to the State's sovereign immunity.

Properties, the substantive property rights PennEast seeks to take on each individual property consists of the following:

   a. A permanent right of way and easement[4] … for the purpose of constructing, operating, maintaining, altering, repairing, changing the size of, replacing and removing a 36-inch diameter pipeline and all related equipment and appurtenances thereto (including but not limited to meters, fittings, tie-overs, valves, cathodic protection equipment and launchers and receivers) for the transportation of natural gas, or its byproducts, and other substances as approved by the FERC Order; and conducting all other activities as approved by the FERC Order together with all rights and benefits necessary for the full enjoyment and use of the right of way and easement … Plaintiff shall have the right from time to time at no additional cost to Defendants to cut and remove all trees including trees considered as a growing crop, all undergrowth and any other obstructions that may injure, endanger or interfere with the construction and use of said pipeline and all related equipment and appurtenances thereto;

   b. A temporary workspace easement[5] … for use during the pipeline construction and restoration period only for the purpose of ingress, egress and regress and to enter upon, clear off and use for construction and all other activities required by the FERC Order; and

   c. Permanent rights of ingress to and egress from the permanent Right-of-Way.

---

[4] All but one of the Condemnation Actions seeks a permanent easement on some segment of each individual property.
[5] All but three Condemnation Actions seek temporary workspace easements.

However, these rights would directly conflict with the conservation easements, declarations and deeds of easement held by State Defendants on many of the State Preserved Properties.

In addition to property rights, PennEast also seeks permanent injunctive relief against State Defendants regarding the State Preserved Properties. According to the Complaints in Condemnation, PennEast seeks to include the following language with the Right-of-Way:

> Further, Defendants shall not excavate, change the grade of or place any water impoundments or structures on the right of way and easement without the written consent of plaintiff, nor may Defendants plant any trees, including trees considered as a growing crop, on the permanent right of way and easement; or use said permanent right of way or any part thereof in such a way as to interfere with Plaintiff's immediate and unimpeded access to said permanent right of way, or otherwise interfere with Plaintiff's lawful exercise of any of the rights herein granted without first having obtained Plaintiff's approval in writing; and Defendants will not permit others to do any of said acts without first having obtained Plaintiff's approval in writing.

The Condemnation Actions fail to meet the threshold requirements of the NGA. The pleadings do not include documentation demonstrating that the proposed geographic scope of the Rights-of-Way sought by PennEast match the FERC-approved route. The Condemnation Actions fail to allege that PennEast sought to negotiate with any Interest Holders such as State Defendants who hold development rights on many of the properties. The Condemnation

12

Actions further fail to allege, as required by the NGA, 15 U.S.C. 717f(h), that PennEast has been unable to acquire the Rights-of-Way by contract or to obtain an agreement with any Interest Holders to a transfer of the necessary Rights-of-Way to construct, operate and maintain the PennEast Project. The Complaint also fails to allege that PennEast offered to pay any compensation to the Interest Holders, as defined therein. The Condemnation Actions fail to allege that State Defendants, or any other Interest Holder, ever claimed the value of their particular interest exceeded any particular amount, let alone $3,000.

### D. PENNEAST'S FAILURE TO ENGAGE IN ANY NEGOTIATIONS

PennEast has not directly engaged State Defendants to negotiate for the property rights they seek through these Condemnation Actions. According to the Condemnation Actions, the "Appraised Value" for each individual property shall mean the fair market value of the Rights-of-Way to be condemned, as set forth in an appraisal prepared by an independent appraiser retained by PennEast ("Appraisal"). Complaint, at ¶2(g). PennEast has not provided State Defendants with a copy of any Appraisal pertaining to the State Preserved Properties, much less an appraisal valuing the unique rights PennEast seek to take from the State Defendants. Yeany Certification, at ¶13; Payne Certification, at ¶10. To date, PennEast has not submitted an offer to any State Defendants for any

of the property rights sought in these Condemnation Actions. Yeany Certification, at ¶13; Payne Certification, at ¶10.

**E. PRELIMINARY INJUNCTION APPLICATION**

On February 15, 2018, upon review of PennEast's application, Judge Martinotti signed an Order To Show Cause ("OTSC") directing Defendants to show cause why an Order should not be entered:

1. Determining that PennEast has satisfied all of the statutory requirements of the Natural Gas Act, 15 U.S.C. 717(h) and is duly vested with the authority to condemn the Rights-of-Way as defined in the Complaint;

2. Granting PennEast's application for an Order of Condemnation for the Rights-of-Way;

3. Finding that PennEast is entitled under the equitable powers of the court to a preliminary injunction in the form of an order for immediate access to and possession of the property rights being condemned;

4. Requiring PennEast to post appropriate security in the form of a surety bond or other undertaking as the Court may direct into the Court's Registry pursuant to Local Civil Rule 67.1(a);

5. Finding that upon this deposit with the Court, PennEast is authorized to immediately enter and take possession of the Rights-of-Way for all purposes allowed under the Federal Energy Regulatory Commission's Order granting PennEast a Certificate of Public Convenience and Necessity, including, without limitation, the performance of survey activities required by the FERC to be completed before construction of the pipeline may commence.

In a Proposed Order submitted with their Preliminary Injunction application, PennEast also seeks the immediate ability to begin

pre-construction activities such as tree clearing. Such destruction could conceivably occur before PennEast satisfies conditions set by FERC in the CPCN, including completion of required threatened and endangered species surveys and wetlands surveys, acquisition of federally required NJDEP Permits, finalization of the pipeline route, and the payment of just compensation. The OTSC scheduled a hearing for April 5, 2018.

## ARGUMENT

### Point I

### ELEVENTH AMENDMENT SOVEREIGN IMMUNITY BARS PENNEAST FROM SEEKING TO CONDEMN STATE PROPERTY IN FEDERAL COURT SINCE THE COURT LACKS JURISDICTION

This court lacks jurisdiction over the State Defendants and cannot enter an Order authorizing PennEast to enter and take possession of the State's property interests in the State Preserved Properties. The Eleventh Amendment to the United States Constitution bars such jurisdiction without the State Defendants' consent and the State Defendants do not consent. The NGA was promulgated under Congress' Article I Commerce Clause power and it is well settled that Congress lacks authority to abrogate state sovereign immunity through the exercise of its Commerce Clause power. Moreover, the plain language of the NGA reveals that Congress never intended for it to be used to abrogate state sovereign immunity.

It is well-recognized that State agencies and State officials acting in their official capacities cannot be sued under the principles of sovereign immunity and the Eleventh Amendment. <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 70-71 (1989). The Eleventh Amendment to the United States Constitution expressly refers to the States' immunity from suit:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign State.

> [U.S. Const. amend. XI].

The Supreme Court describes the phrase "Eleventh Amendment" immunity as:

> something of a misnomer, for the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment. Rather, as the Constitution's structure, and its history, and the authoritative interpretations by [the Supreme Court] make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the Convention or certain constitutional Amendments.

> [<u>Alden v. Me.</u>, 527 U.S. 706, 712-13 (1999)]

Sovereign immunity is not merely a defense against liability; it is an immunity from suit. <u>Fed. Mar. Comm'n v. South Carolina State Ports Auth.</u>, 535 U.S. 743, 766 (2002).

Regardless of whether the suit seeks monetary damages or injunctive relief, a suit against a State or its officials is barred in federal court, if the decree would operate against the sovereign. Pennhurst State School Hosp. v. Halderman, 465 U.S. 89, 101 (1984) (citing Hawaii v. Gordon, 373 U.S. 57, 58 (1963), per curiam). The type of relief sought by a private citizen is "irrelevant to the question [of] whether the suit is barred by the Eleventh Amendment." Fed. Mar. Comm'n., supra, 535 U.S. at 765 (quoting, Seminole Tribe of Florida v. Florida, 517 U.S. 44, 58 (1996)). Noting the general rule, the Supreme Court in Pennhurst reaffirmed its previous determination that a suit is against the State if the judgment would be paid out of the State treasury or would interfere with government administration. Pennhurst, supra, 465 U.S. at 101 n.11 (citing Dugan v. Rank, 372 U.S. 609, 620 (1963)). Likewise, if the judgment operates to compel the State to act or to restrain it from action, the suit is deemed to be against the sovereign. Id. Here, PennEast seeks to interfere with and affirmatively condemn the State's own property rights. See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 281-282 (1997)(Eleventh Amendment bars quiet title against a State in federal court absent the State's consent); Clean Air Council v. Mallory, 226 F. Supp. 2d 705 (E.D. Pa. 2002)(a state has a special state sovereignty interest in the state's title, control, possession, and ownership of water and land.)

## A. The Limited Exceptions to Immunity Do Not Apply

Three limited exceptions exist to State sovereign immunity, and none apply to PennEast's Condemnation Actions.  Under the first exception, Congress may abrogate a State's Eleventh Amendment immunity for rights protected under the Fourteenth Amendment. College Sav. Bank v. Florida Prepaid Post Secondary Educ. Expense Bd., 527 U.S. 666, 670 (1999).

Here, PennEast has not brought its Condemnation Actions under the Fourteenth Amendment. Moreover, while not explicitly stated, Congress clearly enacted the Natural Gas Act ("NGA") under its Article I Commerce Clause power. The NGA declares:

> the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

> [15 U.S.C. 717]

However, the Supreme Court has made it clear that Congress lacks power under Article I to abrogate the States' sovereign immunity from suits commenced or prosecuted in the federal or state courts. Alden, supra, 527 U.S. at 712 (citing Seminole Tribe of Florida, supra, 517 U.S. 44).

> Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting

States. The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.

[Seminole Tribe of Florida, supra, 517 U.S. at 73]

To do so would allow Congress to impermissibly expand the scope of the federal courts' Article III jurisdiction. See Id. at 65.

The second exception to the doctrine of Eleventh Amendment immunity is when a State consents to being sued, i.e., waiver. Blatchford v. Native Village of Noatak & Circle Village, 501 U.S. 775, 779 (1991). However, consent only exists when a State "makes a 'clear declaration' that it intends to submit itself" to a Court's jurisdiction. College Savings Bank v. Florid Prepaid Postsecondary Ed. Expense Bd., 527 U.S. 666, 675-76 (quoting Great Northern Life Ins. v. Read, 322 U.S. 47, 54 (1944)). Anything less than an unequivocal waiver of immunity will not subject a State to suit. Pennhurst, supra, 465 U.S. at 99.

Even when a State statute expressly consents to a suit in the State's own courts, consent to a similar suit in federal court will not be inferred, unless the statutory language is clear the State intended to waive Eleventh Amendment immunity. Skehan v. Board of Trustees of Bloomsburg State College, 590 F.2d 470, 487 (3d Cir. 1978), cert. denied, 444 U.S. 832 (1979). For example, the District Court has determined the State of New Jersey has not, by

enacting the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq., which waives, in part, the State's sovereign immunity from suit, waived its Eleventh Amendment immunity from suit in federal court. Rudolph v. Adamar of N.J., Inc., 153 F. Supp. 2d 528, 543-544 (D.N.J. 2001)

A state may consent to suit in federal court by accepting a gift or gratuity from Congress when waiver of sovereign immunity is a condition of acceptance. This so-called gratuity waiver must be knowing and voluntary and Congress must make its intention to condition acceptance of a gratuity on the waiver of Eleventh Amendment immunity "unmistakably clear."

In Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot., 833 F.3d 360 (2016), the Third Circuit applied the gratuity waiver doctrine to the Natural Gas Act ("NGA"), specifically section 19(d) which grants the Court of Appeals jurisdiction to review state agency action. However, in what the Court described as a limited carve out, the waiver only applied to State regulatory decisions under the federal Clean Water Act and Clean Air Act in connection with an NGA project. The NGA specifically allows States the option to regulate natural gas facilities under those Acts. In Delaware Riverkeeper, the Third Circuit held that States waive their immunity to suits when they choose to do so. Here, these Condemnation Actions do not implicate any regulatory decision made by State Defendants in connection with an NGA project. New Jersey

is named as a defendant due to its valuable property rights and interests in the State Preserved Properties. Thus, the gratuity waiver doctrine does not apply.

The third exception to the doctrine of Eleventh Amendment immunity is under Ex Parte Young. This exception holds that state officials may be sued in federal court for injunctive relief to prevent a continuing violation of federal law. Ex Parte Young, 209 U.S. 123 (1908). Here, State officials are not alleged to be violating federal laws. Therefore, the Ex Parte Young exception does not apply.

In sum, in these Condemnation Actions PennEast seeks to bring State Defendants into federal court as a defendant without the State's consent. In doing so, PennEast seeks to not only take property rights away from the State but to permanently enjoin State Defendants from the full enjoyment of those rights. Since none of the exceptions to Eleventh Amendment immunity apply, the State Defendants are immune from suit and the federal court lacks jurisdiction.

**Point II**

**PENNEAST'S CONDEMNATION POWER IS LIMITED**

State Defendants' immunity is further supported by the nature of these Condemnation Actions and the fact that PennEast, a private entity, is pursuing the actions on its own behalf. The Supreme Court has distinguished between authorization "to exercise the

sovereign's power of eminent domain on behalf of the sovereign itself" and "statutes which grant to others, such as public utilities, a right to exercise the power of eminent domain *on behalf of themselves*." U.S. v. Carmack, 329 U.S. 230, 243 n.13 (1946) (*emphasis added*). The former carries all the powers of the federal government, except those that are expressly excluded. The latter grants of authority "are, in their very nature, grants of limited powers" that do not include any "sovereign powers" greater than what is expressly authorized. Ibid.

This distinction is well-recognized with respect to Amtrak, where it has been held that Amtrak has only a limited grant of eminent domain authority even though Amtrak is the government-sponsored national railroad which carries attributes of a governmental agency for some purposes. See, e.g., Amtrak v. 900 2nd St. Northeast, 266 F. Supp. 3d 63, 67 (D.D.C. 2017) ("Because Amtrak is a government-sponsored corporation and not a government entity, see 49 U.S.C. 24301(a), its eminent domain statute falls within th[e] latter category."); National R. Passenger Corp. v. Two Parcels of Land, 822 F.2d 1261, 1264 (2d Cir. 1987) ("Amtrak has not been authorized to exercise the sovereign's power of eminent domain. It has been granted a limited power, within the meaning of United States v. Carmack, . . .").

Here, the NGA is a statutory grant of limited authority, with PennEast exercising eminent domain authority on its own behalf, not

on behalf of the federal government. The pipeline will be owned and operated by PennEast, not the federal government.   And unlike Amtrak, PennEast is not even a governmental agency with any attributes of a public agency.

Moreover, the NGA does not even expressly attempt to authorize private entities to sue states in federal court. In fact, the NGA is silent regarding eminent domain against a State entity. And as explained above, when Congress has been permitted to abrogate a State's Eleventh Amendment immunity with respect to rights protected under the Fourteenth Amendment, the Supreme Court has ruled the abrogation must be "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" Pennhurst, supra, 465 U.S. at 99 (quoting Quern v. Jordan, 440 U.S. 332, 342 (1979)).   The NGA contains no such expression of Congressional intent to abrogate state sovereign immunity and, in any event, the NGA is not an act adopted to protect Fourteenth Amendment rights.   Accordingly, PennEast lacks the power under the NGA to condemn the State Defendants' rights and interests in the State Preserved Properties.

## Point III

<u>THE COURT SHOULD DECLINE PROCEEDING WITH PENNEAST'S CLAIMS AGAINST THE NON-STATE PROPERTY OWNERS BECAUSE STATE DEFENDANTS ARE INDISPENSABLE FOR DETERMINING JUST COMPENSATION</u>

This court should decline to proceed with PennEast's claims against the other Defendants because State Defendants are indispensable for determining just compensation. As explained above, State Defendants are immune from suit in federal court. Therefore, the State Defendants' property rights in the State Preserved Properties cannot be condemned as part of these Condemnation Actions. State Defendants' property rights have real substantive value in these Condemnation Actions which seek to pave the way for a natural gas pipeline that lies far outside of the uses allowed on the State Preserved Properties. Because any compensation must be allocated between the property owners, including State Defendants, the State Defendants are an indispensable party holding most of the value to any proceeding concerning compensation. Thus, this court should dismiss the condemnation claims against the other Defendant property owners since the State Defendants cannot be a party in federal court.

### Point IV

**PLAINTIFF HAS NOT SATISFIED THE NATURAL GAS ACT'S EMINENT DOMAIN REQUIREMENTS WITH RESPECT TO THE STATE PRESERVED PROPERTIES**

If the District Court should determines that it does have jurisdiction over State Defendants in the Condemnation Actions, these Actions should be dismissed because PennEast has failed to meet the required prerequisites under the NGA to even file the Condemnation Actions against the State Defendants.  To bring suit

in federal court under the Natural Gas Act, the plaintiff must have been granted a certificate by the FERC; show that it has been unable to acquire the rights of way by a contract with the property owner; and establish that the value of the property interest as claimed by the owner is more than $3000. 15 U.S.C. § 717f(h). Here, PennEast has not established that the State Preserved Properties are within the scope of the route approved by FERC. Further, PennEast did not even attempt to secure the State Preserved Properties prior to these lawsuits. Further, State Defendants have not been afforded a chance to claim any value for their respective property interests, let alone any exceeding $3,000. Therefore, PennEast's claims against the State Defendants and their interests should be dismissed on the grounds that PennEast has not followed the procedural prerequisites for filing the Condemnation Actions.

A. **Plaintiff has not established it has a FERC Certificate regarding the State Preserved Properties**

Under the NGA, PennEast must establish that it has a FERC certificate covering the property it seeks to condemn. 15 U.S.C. 717f(h). PennEast has not done so. A review of their pleadings shows that PennEast has failed to attach documentation demonstrating that the proposed geographic scope of the Rights-of-Way match the FERC-approved route. The pleadings include only PennEast's proposed Rights-of-Way, the Order and a blind assertion

that the State Preserved Properties fall within the FERC-approved route. England Decl. at ¶ 7. The pleadings do not contain any documentation of the Project route FERC approved, whether the Project will be on any particular property, and where the Project will be on any particular property. Thus, PennEast's Complaints should be dismissed as deficient.

**B. State Defendants are "Property Owners" under the NGA**

The State Defendants hold valuable property rights on the State Preserved Properties needed for the Project. All lands acquired or developed through the NJDEP's Green Acres Program are restricted to recreation and conservation purposes. N.J.S.A. 13:8C-31; N.J.S.A. 13:8C-32; N.J.A.C. 7:36-2.1.

All development easements purchased by the SADC and all transactions where SADC provides grants to counties, municipalities and nonprofits include the absolute prohibition against non-agricultural uses. N.J.A.C. 2:76-6.15 and N.J.A.C. 2:76-6.15(a)2. In addition, The Right-of-Way PennEast seeks is not a permitted use under the DRCC Conservation Easement. See Exhibit D to Complaint for Dkt. No. 18-01774.

In direct conflict with these valuable State property interests, PennEast seeks to condemn a permanent Right-of-Way and easement over State Defendants' preserved properties to construct and operate a 36-inch diameter pipeline and all related equipment and appurtenances to ship natural gas. The Right-of-Way directly

conflicts with the State Defendants' interests, which is why PennEast seeks to condemn them.

Treating State Defendants as property owners for purposes of the NGA is consistent with federal law. Property ownership receives broad treatment under federal law, and includes interests less than fee simple. In United States v. General Motors Corp, 323 U.S. 373 (1945), the U.S. Supreme Court set an expansive interpretation of "property" for eminent domain purposes. (interpreting "property" as it is used in the Takings Clause of the U.S. Constitution to mean a variety of interests in land less than fee simple). See also Nancy A. McLaughlin, Condemning Conservation Easements: Protecting the Public Interest and Investment in Conservation, 41 U.C. Davis L. Rev. 1897, 1909-1910 (2008). Federal case law also views conservation easements as property interests. United States v. Welte, 635 F.Supp. 388, 389 (D.N.D. 1982); see also Whitehouse Hotel L.P. v. Comm'r, 615 F.3d 321, 331 (5th Cir. 2010) (recognizing a conservation easement as a property interest).

Not one of the other named Defendants, Landowners and Interest Holders alike has the authority to contract away the State property interests needed by PennEast for the Rights-of-Way. The State Defendants' property rights cannot be cast aside by condemning those remaining interests held by the non-State Defendants. The NGA requires entities like PennEast to negotiate with property owners prior to initiating suit. This requirement is grounded in judicial

efficiency and would not make much sense if it did not require PennEast to at least attempt to negotiate with each entity that controlled an interest necessary for the Right-of-Way. Therefore, State Defendants should be considered property owners under the NGA.

C. **PennEast Failed to Negotiate with State Defendants as Required by the NGA**

PennEast has failed to satisfy the threshold elements to federal court jurisdiction under the NGA as to the State Defendant property owners and the State Preserved Properties. As explained earlier, before an a FERC certificate-holder can exercise eminent domain authority in federal court, it must first show that it has been unable to acquire the necessary rights-of-way by a contract with the property owner and the value of the property interest as claimed by the owner exceeds $3000. 15 U.S.C. 717f(h). Here, PennEast chose not to even negotiate with State Defendants regarding the State Preserved Properties in these Condemnation Actions.[6] Yeany Certification, at ¶13; Payne Certification, at ¶10.

---

[6] Various State Defendants did receive offer letters from PennEast concerning rights-of-way for the pipeline in late January, 2018. However, these letters did not pertain to the State Preserved Properties subject to these Condemnation Actions. Further, the letters did not provide sufficient information or give State Defendants a reasonable amount of time to consider the offers. Instead, the PennEast letters gave State Defendants less than two weeks to accept the monetary offers and sign the PennEast-drafted right-of-way agreement. State Defendants responded by letter dated February 2, 2018 declaring that PennEast's letters were not an attempt to negotiate at all. See Exhibit 1 to Declaration of Mark

The plain language of the NGA clearly infers that PennEast must negotiate with impacted property owners such as State Defendants before it can exercise eminent domain authority in federal court. According to the NGA, eminent domain proceedings are only available in federal courts "[w]hen any holder of a certificate of public convenience and necessity <u>cannot acquire by contract</u>, or is unable to agree with the owner of property to the compensation to be paid for" and "when the amount claimed by the owner of the property to be condemned exceeds $ 3,000". 15 <u>U.S.C.</u> 717f(h)(emphasis added). Here, PennEast fails to meet either benchmark. It provided no offers or appraisals, let alone good-faith negotiations with State Defendants for the State Preserved Properties. Yeany Certification, at ¶13; Payne Certification, at ¶10.

PennEast's failure to negotiate with State Defendants is reflected in its pleadings. PennEast gives different treatment in its pleadings to what it terms "Landowners" and "Interest Holders". PennEast places the State Defendants in the latter category, which PennEast's pleadings define to mean "other person[s] and corporations appearing of record to have an interest in the said land and premises and person and corporations who have or may claim to have an interest therein...." Complaint, at ¶2(i).

_____

Collier (Hereinafter "Collier Certification").

Nowhere in its pleadings does PennEast allege that it sought to acquire the property interests by contract or attempted to negotiate with State Defendants or any other "Interest Holder". PennEast alleges that it "contacted the *Landowners* several times in an effort to negotiate in good faith" and that it "has been unable to acquire the Rights of Way by contract or to obtain an agreement with the *Landowners* on the amount of compensation to be paid for the Rights of Way". Complaint, at ¶30. (*Emphasis added*) PennEast further alleges that it offered to pay the Landowners at least $3,000 for the Rights of Way and the Landowners refused the offer. Complaint, at ¶32. But PennEast makes no such allegations as to the State Defendant "Interest Holders". In fact, PennEast's pleadings allege that only the "Landowners" are entitled to just compensation for PennEast's takings. Complaint, at ¶39-40; see Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)(quotations and citations omitted).

As a matter of federal policy, efforts to obtain property voluntarily through negotiation should be undertaken before invoking condemnation powers and filing suit. See 42 U.S.C. 4251; 49 C.F.R. 24.102(a). The NGA reflects this policy by requiring proof that the property interests could not be obtained voluntarily. 15 U.S.C. 717f(h).

As its pleadings plainly indicate, PennEast has not negotiated with State Defendants for the State Preserved Properties. It provided no offers or underlying appraisals to the State Defendants

for the State Preserved Properties. PennEast has failed to meet the threshold elements to federal court jurisdiction under the NGA as to State Defendants and the State Preserved Properties. Accordingly, PennEast's claims against the State Defendants should be dismissed.

## Point V

### PLAINTIFF'S PRELIMINARY INJUNCTION APPLICATION IS NOT RIPE

Even if this court were to exercise jurisdiction over the State Defendants, it should not consider PennEast's preliminary injunction application because PennEast has not established a substantive right to condemnation. See Transwestern Pipeline Co., LLC v. 17.19 Acres, 550 F.3d 770, 777 (9th Cir 2008)(citing Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 323 (1999)) FERC Certificate Holders must secure an Order of Condemnation from court before they can take possession. See Transwestern Pipeline Co., LLC v. 17.19 Acres, supra, at 777. However, as explained in Point IV above, PennEast has not satisfied the necessary elements under the NGA to condemn the State Preserved Properties. Therefore, they are not entitled to an Order of Condemnation and this court lacks authority to grant a preliminary injunction.

## Point VI

### PLAINTIFF FAILS TO MEET ANY OF THE FOUR PRONGS NECESSARY TO OBTAIN A PRELIMINARY INJUNCTION

Even if the court finds it has jurisdiction over the State Defendants and that PennEast is otherwise entitled to an Order of Condemnation, Plaintiff fails to meet the criteria for a preliminary injunction.

Preliminary injunctive relief is an "extraordinary equitable remedy" that should be granted "only in limited circumstances." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (quoting Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)). To obtain a preliminary injunction, the moving party must establish that it satisfies each of four elements: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." Id. "Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue." Opticians Assn of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990)(emphasis added). An injunction should only issue "upon a clear showing that the plaintiff is entitled to such relief." Groupe SEB United States, Inc. v. Euro-Pro Operating, LLC, 774 F.3d 192, 197 (3d. Cir. 2014)(quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). PennEast is not entitled to

preliminary relief here because it cannot establish any, much less all, of the four injunction factors.

### A. PennEast has not established a likelihood of success on the merits

As set forth above, the Eleventh Amendment to the United States Constitution bars jurisdiction over the State Defendants. Further, PennEast has failed to satisfy and adequately plead the threshold elements required under the NGA for an eminent domain action in federal court. For those independent and mutually exclusive reasons alone, PennEast's claims against the State Defendants should be dismissed. Irrespective of those reasons for outright dismissal, PennEast is unlikely to succeed on the merits because the Rights-of-Way it seeks to condemn herein exceed the scope of the FERC Order.

The FERC Order precisely defines the size of the pipeline as well as the products that can be transported through it. The Order defines the "Project" as "a new 116-mile natural gas pipeline from Luzerne County, Pennsylvania, to Mercer County, New Jersey, along with three laterals extending off the mainline, a compression station, and appurtenant above ground facilities." Order, at ¶1. The Order notes the Project will provide natural gas service to markets in "New Jersey, New York, Pennsylvania, and surrounding states." Id. at ¶4. In fact, the Order specifically declares:

> PennEast's right of eminent domain granted under NGA section 7(h) does not authorize it

33

> to increase the size of its natural gas
> facilities to accommodate future needs or to
> acquire a right-of-way for a pipeline to
> transport a commodity other than natural gas.

[Id. at Appendix A ¶4]

The Rights-of-Way that PennEast seeks to condemn here ignore these FERC limitations and exceed the scope of the Project allowed under the Order. In its pleadings, PennEast seeks the permanent authority to "change the size of" the pipeline. Complaint, ¶ 2(f)(1) line 3. PennEast also seeks the permanent ability to transport natural gas "byproducts and other substances." Complaint, Paragraph 2(f)(1) lines 8-9. As explained above, FERC itself prohibits PennEast from changing the size of the pipeline or transporting anything other than natural gas through the pipeline. Therefore, PennEast is not likely to succeed on the merits as the Rights-of-Way that it seeks to condemn exceed the scope of its authority under the Order.

## B. PennEast cannot establish irreparable harm

Preliminary injunctive relief is appropriate only when a plaintiff establishes irreparable harm. Kos Pharm., supra, 369 F.3d at 708. That harm must be immediate, as harm that "will occur in the indefinite future" is not irreparable. Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1991). Moreover, harm is not irreparable where it may be remedied at law through the payment of damages. Pappan Enters. v. Hardee's Food Sys., 143 F.3d 800, 805

(3d Cir. 1998) (explaining that harm is irreparable only if it is "of a peculiar nature, so that compensation in money alone cannot atone for damages" (citation and quotation marks omitted)). Similarly, courts should pay particular regard to the "public consequences of employing the extraordinary remedy of injunction." Winter v. Natural Res. Def. Council., 555 U.S. 7, 24 (2008). Here, any harm incurred by PennEast would be illusory and created by PennEast's own choice to prematurely enter contracts before it has satisfied all conditions set by FERC in the CPCN, including all required environmental permits. Further, PennEast could easily obtain an extension of the FERC deadline. Therefore, PennEast fails to meet the irreparable harm prong necessary for a preliminary injunction.

PennEast cites to an in-service date mandated by FERC as the key reason why it would suffer irreparable harm. However, there is no reason to believe the date could not be extended. FERC does not offer any substantive basis requiring construction completion within two years of the Order. Order, at ¶219(B)(1), Further, neither the NGA nor FERC's own regulations require construction on interstate pipelines to be complete within two years, or any particular time of an Order. See 18 C.F.R. 157.20(b). Instead, FERC has the inherent authority to provide PennEast with more time to complete construction. Under FERC regulations, "the time by which any person is required or allowed to act under any statute,

rule, or order may be extended … for good cause, upon a motion made before the expiration of the period prescribed or previously extended." 18 C.F.R. 385.2008. In fact, a search of past FERC Orders shows that FERC routinely grants extensions regarding in-service dates to interstate pipeline companies such as PennEast[7].

To the extent that PennEast argues that it would suffer irreparable harm because of its own contractual obligations to provide natural gas, this court should not be persuaded. PennEast has not included any of its contracts to supply gas in the record for these Condemnation Actions and, as a result, the State Defendants have had no chance to review the contracts to determine whether those contracts require, without any exceptions, a particular service date. Further, any obligations PennEast might have with such contracts are PennEast's own doing and have nothing to do with the State Defendants. PennEast's self-created urgency should not be used to constitute irreparable harm for an injunction against the State Defendants to run pipelines through preserved

---

[7] A representative sample of the many FERC Orders granting extensions to pipeline companies regarding in-service dates includes the following: Letter Order Granting Extension of Time to Millennium Pipeline Company, Docket No. CP16-17-000, Accession No. 20171003-3029 (October 3, 2017)(granting a one year extension due to local permitting issues); Letter Order Granting Extension of Time to Pine Prairie Energy Center, LLC, Docket No. CP11-1-000, Accession No. 20170328-3057 (March 28, 2017)(granting three year extension); Letter Order Granting Extension of Time to National Fuel Gas Supply Corporation Docket No. CP16-37-000, Accession No. 20170223-3002 (February 23, 2017)(granting one year extension due to local permitting issues).

lands. Thus, PennEast has not satisfied the irreparable harm prong necessary for a preliminary injunction.

### C. The State Defendants will suffer greater harm if preliminary relief is granted and the public interest does not favor a preliminary injunction as the condemnations are premature

The State Defendants will suffer greater harm than Plaintiffs if the preliminary injunction is granted, and "[a] preliminary injunction should not be granted if it will cause greater harm to the defendant than the plaintiff would suffer." Flamini v. Velez, 2013 U.S. Dist. LEXIS 101182, 12-13 (D.N.J. 2013) (citing Nutrasweet Co. v. Vit-Mar Enters., 176 F.3d 151 (3d Cir. 1999)). The proposed Project route currently runs through nearly fifty properties in New Jersey in which the State, a county, a municipality, or a non-profit group either own or hold a conservation easement or restriction. Disruption of New Jersey's preserved open space and farmland preservation programs, unnecessary condemnation, and premature forest clearing are significant harms which cannot be monetarily compensated. Given the ongoing proceedings before FERC and the likelihood that the pipeline route could change as a result of determinations made by NJDEP with respect to avoidable impacts to wetlands and other environmental resources, a preliminary injunction at this stage is premature and not in the public interest.

#### (i) State Open Space and Farmland Preservation Programs will be Disrupted

In the case of the State Preserved Properties, the State Defendants have acquired their property rights in support of a long held state policy encouraging open space acquisition and farmland preservation. In New Jersey, open space is under constant development pressure, making open space and farmland scarce resources. The State Defendants have consistently used monies approved by the voters under the New Jersey Constitution to purchase permanent preservation interests. N.J. Const. art. VIII, § 22, ¶ 6 & 7. In 1998, New Jersey voters approved a Constitutional Amendment that created New Jersey's first stable source of funding for open space, farmland, and historic preservation efforts from the State Sales and Use Tax. N.J. Const. art. VIII, § 22, ¶ 7. This Constitutionally-dedicated money is set aside annually:

> to provide funding, including loans or grants, for the acquisition and development of lands for recreation and conservation purposes, for the preservation of farmland for agricultural or horticultural use and production, and for historic preservation

> Ibid.

In 2014, New Jersey voters again amended the Constitution to provide added funding for open space and farmland preservation, this time from part of the State's Corporate Business Tax. N.J.

Const. art. VIII, § 22, ¶ 6. This Constitutionally dedicated money

is set aside annually:

> only for: providing funding, including loans
> or grants, for the preservation, including
> acquisition, development, and stewardship, of
> lands for recreation and conservation
> purposes, including lands that protect water
> supplies and lands that have incurred flood or
> storm damage or are likely to do so, or that
> may buffer or protect other properties from
> flood or storm damage; providing funding,
> including loans or grants, for the
> preservation and stewardship of land for
> agricultural or horticultural use and
> production;

> Id.

New Jersey's dedication towards open space and farmland

preservation is reflected in several statutory provisions and bond

issuances. In the Garden State Preservation Trust Act, N.J.S.A.

13:8C-1, et seq. ("GSPTA"), the New Jersey Legislature found:

> … that the acquisition and preservation of
> open space, farmland, and historic properties
> in New Jersey protects and enhances the
> character and beauty of the State and provides
> its citizens with greater opportunities for
> recreation, relaxation, and education; *that
> the lands and resources now dedicated to these
> purposes will not be adequate to meet the
> needs of an expanding population in years to
> come.* . .

> The Legislature further finds and declares
> that the citizens of the State have indicated
> their very strong support for open space,
> farmland, and historic preservation efforts
> not only in the past approval of State Green
> Acres bond acts and numerous county and
> municipal dedicated funding sources for those
> purposes, but most recently in 1998 with the

approval of an amendment to the New Jersey
Constitution that provides for a stable and
dedicated source of funding for those purposes
for the next decade and beyond.

The Legislature therefore determines *that it
is in the public interest to preserve as much
open space and farmland, and as many historic
properties, as possible* within the means
provided by the 1998 constitutional amendment;
that of the open space preserved, as much of
those lands as possible shall protect water
resources and preserve adequate habitat and
other environmentally sensitive areas…
N.J.S.A. 13:8C-2 (*emphasis added*).

To support these long-held State policies, New Jersey has
maintained open space and farmland preservation programs within the
NJDEP and SADC, respectively. The NJDEP's Green Acres program was
created in 1961 to help the State acquire, and to assist local
governments to acquire land for recreation and conservation. See
N.J.S.A. 13:8A-1 et seq. As noted herein, since 1961 the State's
citizens have approved all 13 Green Acres bond referendums,
totaling $3.32 billion. Yeany Certification, at ¶6. As of August
2017, the Green Acres Program has preserved in perpetuity over
650,000 acres land in New Jersey. Id., at ¶8.

SADC was established in 1983 by the Right to Farm Act,
N.J.S.A. 4:1C-1 to -10, to support farm operations. N.J.S.A. 4:1C-
4(a). That same year, the Legislature passed the Agriculture
Retention and Development Act ("ARDA"), which recognizes that "the
agricultural industry and the preservation of farmland are

important to the present and future economy of the State and welfare of [its] citizens[.]" N.J.S.A. 4:1C-12(a).

The ARDA authorized the SADC to preserve the dwindling amount of farmland throughout the State by purchasing farmland, purchasing development easements, and providing cost-share grants to counties, N.J.S.A. 4:1C-11, et seq., thereby preserving, in perpetuity, the lands for agricultural uses. N.J.S.A. 4:1C-32. As of 2017, SADC and its partners have preserved over 2,500 farms, comprising over 200,000 acres of preserved farmland. Payne Certification, at ¶6. More than $1 billion of State monies have been committed to preserve farmland since the Farmland Preservation Program's inception. Ibid.

The condemnation by a private entity of these properties that have been preserved for open space and farmland preservation purposes, as mandated by the New Jersey Constitution and the Legislature, is an affront to the State Defendants' long-held policy initiatives. As a result, premature condemnation and destruction of these preserved and protected lands would significantly harm the State and its citizens and monetary damages would be inadequate.

**(ii) The Pipeline Route is Likely to Change**

As PennEast admits, it still must complete surveys for about two thirds of the pipeline route in New Jersey. It must also collect the information needed to comply with the Environmental

Conditions in the FERC Order and submit the required filings with state agencies and FERC. England Decl. at ¶ 18. Site-specific property surveying tasks that PennEast must complete include, without limitation:

a. civil surveys, including Right of Way delineation and boundary surveys;

b. identification of any adverse site conditions that might impede construction, including constructability reviews;

c. delineation of wetlands, waterbodies or other environmentally sensitive areas, followed by post-inspection verification of the survey results by the United States Army Corps of Engineers ("USACE") and the New Jersey Department of Environmental Protection ("NJDEP");

d. archeological/architectural investigations, to identify any cultural resources including historical sites and artifacts;

e. plant and wildlife surveys, including identification of threatened and endangered animal and plant species;

f. geotechnical testing and analysis, to determine subsurface soil, bedrock and groundwater characteristics; and

g. other surveys that may become necessary.

[Id. at ¶15.]

Further, before PennEast can begin construction, it must:

• file any revised detailed survey alignment maps/sheets for all facilities approved by the FERC Order;

- complete needed surveys to identify water supply wells, groundwater seeps and springs, and identify public and private water supply wells within the construction workspace;

- complete wetlands delineation;

- map potential vernal habitats; complete surveys to determine the presence of state listed threatened and endangered species, file information regarding residences in close proximity to the Project, which are located within previously un-surveyed areas; and

- complete remaining cultural resource surveys. Id. at 18(b), (h), (j), (k), (n), (o), (p).

The Order is also conditioned upon PennEast acquiring a water quality certificate and a freshwater wetlands individual permit from the NJDEP pursuant to the State's assumption of Clean Water Act authority under the NGA. Order, Appendix A, ¶10 (requiring PennEast to demonstrate it has all "federal authorizations" prior to commencing construction). However, PennEast does not even have a permit application pending before NJDEP at this time. Considering so little survey work has taken place, it is likely the pipeline route could ultimately be changed prior to construction to avoid environmental and historic resources. Such changes would shift the geographic Rights-of-Way PennEast now seeks and possibly move the Project off a particular property entirely.

Moreover, on February 20, 2018, NJDEP filed a joint stay-rehearing request regarding the underlying FERC Order. NJDEP is but one of numerous parties who have requested a rehearing of the FERC Order. NJDEP's own submission includes over ten specific issues which either require rescission of the Order or significant amendments. FERC's review will take time.

Allowing PennEast to immediately acquire permanent rights to the State Preserved Properties without giving sufficient time for FERC review would be contrary to the public interest. Delaying PennEast's immediate acquisition of both temporary and permanent property rights would protect vulnerable preserved State property while ensuring the pipeline route is mapped based on sound environmental and public health data; and would avoid future changes and uncertainty due to the current lack of information. It is in the public interest to ensure the condemnation process is not prematurely exercised while the underlying Order is under challenge, while permits are outstanding, and while the Project route may change.

As an alternative, to the extent this court finds that PennEast has satisfied the four prongs necessary for a preliminary injunction, the State Defendants ask that such injunction be expressly limited to allow access only. The only immediate harm PennEast can point to is related to their need to get onto the properties to survey, take soil borings, and conduct other

environmental assessments. <u>Acierno</u> <u>v.</u> <u>New Castle County</u>. 40 F. 3d. 645, 655 (3rd Cir. 1994) Temporary and limited access would allow PennEast and NJDEP to do that. Permanent easements are premature until all environmental analyses have been completed along 100% of the Project route, all permits have been issued, and the precise route has been finalized. NJDEP also requests that any resulting condemnation order for perpetual easements include provisions which state that the easement will expire, by its terms, if the Project is not constructed and operational by a certain date.

Such a ruling by the court would enable all parties to have a full understanding of the environmental impacts from the Project while avoiding unnecessary condemnation and damage to environmentally sensitive resources. Enabling PennEast to condemn perpetual easements before knowing whether the route must be shifted to avoid environmental impacts will place the preserved nature of the land at risk, even if the pipeline would never ultimately cross that land due to route changes. Moreover, condemning permanent easements at this stage with inadequate environmental information to guide the route is unwise and inequitable due to likely later route changes.

<u>CONCLUSION</u>

For the reasons set forth herein, this court should dismiss PennEast's Condemnation Actions. The Eleventh Amendment to the United States Constitution bars condemnations of State Property. If

this court were to exercise jurisdiction over the State, the Condemnation Actions should be dismissed because PennEast has not satisfied the threshold requirements of the Natural Gas Act.

Furthermore, if the State Defendants are dismissed, the Condemnation Actions should not proceed against the Landowners whose lands have been preserved by the State since valuation of the State's interests are indispensable to the full resolution the amount of compensation required and its allocation between the landowners and the State Defendants. If this court were to exercise jurisdiction over the State Defendants despite sovereign immunity and find that PennEast had satisfied the threshold requirements of the Natural Gas Act, PennEast's preliminary injunction application should still be denied because it fails to meet the four prongs necessary for such an order.

For these reasons, the State Defendants respectfully request that the Condemnation Actions against the State Defendants and the respective property owners be dismissed and PennEast's request for injunctive relief be denied.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY


By:  s/ Mark Collier
     Mark Collier (MC6192)
     Deputy Attorney General